CASE NO. 25-3880

# United States Court of Appeals
# For The Sixth Circuit

---

*Karen Cahall,*
*Plaintiff-Appellant*

*v.*

*New Richmond, OH, Exempted Village School District; Tracey Miller, Todd Wells, Tim Dufau, Robert Wooten, Jonathon Zimmer, Amy Story, in their official capacities as members of the New Richmond, OH Exempted Village School District Board of Education,*
*Defendants-Appellees*

---

On appeal from the United States District Court
For the Southern District of Ohio
Case No. 1:24-CV-688

---

## MERIT BRIEF OF APPELLANT KAREN CAHALL

---

Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Appellant Karen Cahall

i

## **CORPORATE DISCLOSURE**

Pursuant to 6th Cir. R. 26.1, Karen Cahall makes the following disclosure:

1.　　Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

　　**NO**

2.　　 Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest.

　　**NO**

## **CERTIFICATE OF SERVICE**

I certify that on February 4, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record

s/Mark P. Herron

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES....................................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT..........................................x

STATEMENT OF JURISDICTION .........................................................................1

STATEMENT OF ISSUES .......................................................................................1

STATEMENT OF THE CASE...................................................................................2

I.     Procedural History .........................................................................................2

II.    Factual Background ........................................................................................3

SUMMARY OF THE ARGUMENT ........................................................................7

ARGUMENT ............................................................................................................9

I.     Standard of Review.........................................................................................9

II.    New Richmond Board Policy 2240 Is Facially Void For Vagueness
       Under The Fourteenth Amendment Substantive Due Process Clause
       And Is Unconstitutional As Applied To Ms. Cahall's Suspension ...............10

       A.    The "Void For Vagueness" Standard ..................................................10

       B.    Board Policy 2240 Need Not Be "Vague In All Applications" To
             Be Unconstitutional.............................................................................14

       C.    Board Policy 2240 Warrants Strict Scrutiny Review Because It
             Is Punitive and Implicates First Amendment Rights...........................16

       D.    New Richmond Board Policy 2240 Is Unconstitutionally Vague.......21

1.  Board Policy 2240 Fails To Give A Person Of Ordinary Intelligence A Reasonable Opportunity To Know What Is Prohibited And What Is Not So That They May Act Accordingly..................................................................21

2.  Board Policy 2240 Is Vague As To What Constitutes An "Instructional Program" ...............................................32

3.  Appellee Miller's Reliance Upon "Community Values" To Determine What Is "Controversial" Is Too Vague And Subjective To Satisfy Due Process ...........................................34

4.  Board Policy 2240's Unconstitutional Vagueness Is Compounded By The Lack of a Scienter Requirement..........36

5.  The Inconsistencies In How The District Applies Board Policy 2240 Evidence Its Unconstitutionality Both Facially And As Applied To Ms. Cahall ...................................38

6.  The Books At Issue Are Not "Sexual" Or About "Sexuality" ...............................................................39

III.  The District Court Erred In Denying Ms. Cahall's Motion for Leave To Amend Her Complaint........................................................42

IV.  The Dismissal Of Ms. Cahall's State Law Claim Pursuant To Ohio Rev. Code §§ 2307.60 and 2921.45 Must Be Reversed If The Dismissal Of Ms. Cahall's Constitutional Claim Is Reversed..............................................44

CONCLUSION .................................................................................44

CERTIFICATE OF COMPLIANCE .......................................................46

CERTIFICATE OF SERVICE .............................................................47

ADDENDUM .................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Amini v. Oberlin College,*
  259 F.3rd 493 (6th Cir. 2010)...........................................................................41

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)......................................................................................10

*Black Emergency Response Team v. Drummond,*
  737 F.Supp. 3rd 1136 (W.D. Ok. 2024) (*Drummond I*)........................... 27-30

*Black Emergency Response Team v. Drummond,*
  737 F.Supp. 3rd 1158 (W.D. Ok. 2024) (*Drummond II*) ......................... 27-30

*Boutilier v. INS,*
  387 U.S. 118 (1967)......................................................................................12

*Buddenberg v. Weisdack,*
  161 Ohio St. 3d 160 (2020) ...........................................................................44

*Carolina Youth Action Project v. Wilson,*
  60 F.4th 770 (5th Cir. 2023)...........................................................................15

*City of Saint Louis v. Praprotnik,*
  485 U.S. 112 (1988)........................................................................................4

*Colautti v. Franklin,*
  429 U.S. 379 (1979)..................................................................................14, 37

*Columbia Natural Resources v. Tatum,*
  58 F.3rd 1101 (6th Cir. 1995) ........................................................................14

*Courtright v. City of Battle Creek,*
  839 F.3rd 513 (6th Cir. 2016).........................................................................10

*Dambrot v. Central Michigan University*,
    55 F.3rd 1177 (6th Cir. 1995) ..................................................................... 11, 21

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) .......................................................................... 12-13, 33

*Guerro v. Whitaker*,
    908 F.3rd 541 (9th Cir. 2018) ........................................................................ 16

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966) ...................................................................................... 16

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................. 11, 18-19

*Johnson v. United States*,
    576 U.S. 591 (2015) ...................................................................................... 15

*Keyishian v. Board of Regents of the University of the State of New York*,
    385 U.S. 589 (1967) ................................................................................. 33-34

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ...................................................................................... 14

*Lanzetta v, New Jersey*,
    306 US. 451 (1939) ................................................................................. 11, 14

*Local 8027, AFL-CIO v. Edelblut*,
    651 F.Supp. 3rd 444 (D. N.H. 2023) ("*Edelblut I*) ................ 25-27, 30, 32, 37

*Local 8027, AFL-CIO v. Edelblut*, Case No. 21-CV-1077
    (D. N.H. May 28, 2024) (*Edelblut II*) .................................... 25-27. 30. 32. 37

*Majestic Building Maintenance, Inc. v. Huntington Bancshares, Inc.*,
    864 F.3rd 455 (6th Cir. 2017) .......................................................................... 9

*Manning v. Caldwell for City of Roanoke*,
    930 F.3rd 264 (4th Cir. 2019) (en banc) ......................................................... 18

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
584 U.S. 617 (2018)..................................................................20

*Miller v. City of Cincinnati,*
622 F.3rd 524 (6th Cir. 2010)........................................12, 31, 34, 36

*Monell v. Department of Social Services,*
436 U.S. 658 (1978)....................................................................4

*NAACP v. Department of Education,*
779 F.Supp. 3rd 53 (D. D.C. 2025)......................................... 29-30

*National Education Association v. Department of Education,*
779 F.Supp. 3rd 149 (D. N.H. 2025)..............................................29

*Ozonoff v. Berzak,*
744 F.2nd 224 (1st Cir. 1984) .....................................................34

*Papachristou v. City of Jacksonville,*
405 U.S. 156 (1972)............................................................ 10-11, 37

*Pembauer v. City of Cincinnati,*
375 U.S. 469 (1986)....................................................................4

*Ridley v. Massachusetts Bay Transportation Authority,*
390 F.3rd 65 (1st Cir. 2004) .......................................................18

*Sessions v. Dimaya,*
584 U.S. 148 (2018)................................................ 11-12, 15-16

*Shuti v. Lynch,*
828 F.3rd 440 (6th Cir. 2016).....................................................12

*State, ex rel., Multimedia, Inc. v. Snowdon,*
72 Ohio St. 3rd 141 (1995) .........................................................17

*Tennessee Educational Association v. Reynolds,*
732 F.Supp. 3rd 783 (M.D. Tenn. 2024), *vacated on other grounds,*
Case No. 3:23-CV-751 (April 17, 2025) ............................... 22-25, 30, 32, 35

*United Food & Commercial Workers Union, Local 1009 v. Southwest Ohio Regional Transit Authority*,
163 F.3rd 341 (6th Cir. 1998)......................................................................13, 21

*United States v. Cook*,
914 F.3rd 545 (7th Cir. 2019)......................................................................15

*United States v. Davis*,
588 U.S. 445 (2019)......................................................................11, 15

*United States v. Salerno*,
681 U.S. 739 (1987)......................................................................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1975)...................................................................... 14, 36-37

*Williams v. City of Cleveland*,
771 F.3rd 945 (6th Cir. 2014)......................................................................10

*Young Israel of Tampa, Inc. v. Hillsborough Area Regional Transit Authority*,
89 F.4th 1337 (11th Cir. 2024)......................................................................18

## Statutes

42 U.S.C. § 1983 ......................................................................*passim*

Ohio Rev. Code § 149.43 ......................................................................17

Ohio Rev. Code § 2307.60......................................................................44

Ohio Rev. Code § 2921.45......................................................................44

## Constitution

U.S. CONST. amend. I......................................................................*passim*

U.S. CONST. amend. XIV......................................................................*passim*

## **<u>Miscellaneous Authorities</u>**

Fed. R. Civ. 12(c) .............................................................................*passim*

Fed. R. Civ. P. 15(a)(2).....................................................................*passim*

## **STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Oral argument is respectfully requested in this matter.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over the within matter pursuant to 28 U.S.C. §§ 1331 and 1343.

The District Court had supplemental jurisdiction over Ms. Cahall's state-law claim for relief pursuant to 28 U.S.C. § 1367(a) in that the state-law claim is so related to claims in the action within such original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court entered final judgment against Ms. Cahall on September 29, 2025, and the notice of appeal was timely filed on October 29, 2025.

## STATEMENT OF ISSUES

Whether New Richmond Board Policy 2240 is unconstitutional on its face, under the "void for vagueness" doctrine of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Whether New Richmond Board Policy 2250 is unconstitutional as applied to Ms. Cahall based upon the well-plead facts in Ms. Cahall's complaint and proposed amended complaint.

Whether based upon the facts plead in the complaint and proposed amended complaint, Ms. Cahall stated claims for which relief could be granted pursuant to Ohio Rev. Code § 2307.67.

1

Whether the District Court erred in denying, on futility grounds, Ms. Cahall's motion for leave to amend her complaint.

## STATEMENT OF THE CASE

### I.   Procedural History

Plaintiff-Appellant Karen Cahall filed this action after she was suspended from her teaching position with the New Richmond Exempted Village School District for three days without pay for having in her classroom four fictional books that had characters that identified as LGBTQ+ (RE 1, *Complaint*).  Ms. Cahall alleged in her complaint that the District policy under which she was suspended, Board Policy 2240, was unconstitutionally vague under the "void for vagueness" – both on its face and as it was applied to her.

Ms. Cahall further alleged that her suspension violated her constitutional rights under the Equal Protection Clause and the Establishment and Free Exercise Clauses.  In that regard, Ms. Cahall alleged that she had maintained the books in furtherance of her sincerely-held moral and religious beliefs that all children, including children who are LQBTQ+ or the children of parents who are LGBTQ+, deserve to be respected, accepted and loved for who they are, that she had advised appellee Miller of that at her pre-disciplinary hearing, and that the District had allowed other teachers to engage in religious activity by permitting them to wear religious insignia and symbols in the presence of other students.

2

Appellees filed an answer to the Complaint on January 29, 2025 (RE 9, Page ID # 38) and filed their Motion for Judgment on the Pleadings on February 20, 2025 (RE 12, Page ID # 52).  Ms. Cahall filed her opposition to the motion and a cross-motion for partial judgment on the pleadings on March 20, 2025 (RE 16, Page ID # 78) and sought leave to amend the complaint on March 21, 2025 (RE 17, Page ID # 146).  Appellees filed their opposition on April 8, 2025 (RE 19, Page ID # 195).

The District Court issued an opinion and order on September 29, 2025 (RE 25 and 26) granting appellees' motion for judgment on the pleadings, denying Ms. Cahall's motion for partial judgment on the pleadings and denying leave to amend the complaint.  The District Court dismissed Ms. Cahall's Due Process claims with prejudice and dismissed her Equal Protection and First Amendment claims without prejudice, allowing her to refile those claims.  This appeal followed.

## II.   **Factual Background**

This case is before this Court on appeal from the District Court's order granting appellees' Motion for Judgment on the Pleadings and denying Ms. Cahall's cross-motion for partial judgment on the pleadings, as well as the District Court's order denying Ms. Cahall's motion to amend her complaint on futility grounds.  Accordingly, the following facts alleged in the Complaint and proposed Amended Complaint must be accepted as true:

3

- The New Richmond Exempted Village School District ("New Richmond") is a public school district located in Clermont County, Ohio, and is governed by an elected Board of Education (RE 1, *Complaint*, ¶ 4, Page ID # 3);

- Appellee Tracey Miller served as Superintendent for New Richmond during the time period relevant to this case (RE 1, *Complaint*, ¶ 6, Page ID # 4);[1]

- New Richmond had in effect during all times relevant to this case a "controversial issues" policy referred to as Board Policy 2240 (RE 1, *Complaint*, ¶ 10, 19-26, Complaint Exhibit 1, Page ID # 4, 6-8, 27-28);[2]

- Board Policy 2240 does not categorically prohibit the introduction or discussion of "controversial issues" and in fact expressly states that "the consideration of controversial issues has a legitimate place in the instructional program of the schools" and expressly acknowledges that when "properly introduced and conducted, the consideration of such issues can help students learn to identify important issues, explore fully and fairly all sides of an issue, weigh carefully the values and factors involved, and develop techniques for formulating and evaluating positions" (RE 1, *Complaint*, ¶ 19-26, Complaint Exhibit 1, Page ID # 6-8, 27-28);

- The plain language of Board Policy 2240 further permits students to initiate the discussion of "controversial issues" and allows a teacher to express a personal opinion on the issue provided it is identified as such and is not done so for the purpose of persuading a student to the teacher's personal view;

- Plaintiff Karen Cahall has taught for the New Richmond Exempted Village School District for over 30 years and has received excellent evaluations for her job performance and teaching (RE 1, *Complaint*, ¶ 4, 34-35, Page ID # 3, 9-10);

---

[1] Appellees did not dispute in their motion that Miller had final decision-making authority on behalf of New Richmond with respect to the discipline administered to Ms. Cahall for purposes of imposing liability on it pursuant to *City of Saint Louis v. Praprotnik*, 485 U.S. 112 (1988) and *Pembauer v. City of Cincinnati*, 375 U.S. 469 (1986).

[2] Appellees have not disputed that Board Policy 2240 constitutes a "custom or policy" of New Richmond for purposes of imposing liability on it pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

- Ms. Cahall has sincerely-held moral and religious beliefs that all children, including children who are LQBTQ+ or the children of parents who are LGBTQ+, deserve to be respected, accepted and loved for who they are (RE 1, *Complaint*, ¶ 12, 37, 48-49, Page ID # 5, 10-12);

- Throughout the course of her employment with New Richmond, Ms. Cahall has maintained numerous books in her classroom on a wide variety of topics and subject matters that students are free to review or read (or not review or read) during their free time (RE 1, *Complaint*, ¶ 42, Page ID # 11);

- The books maintained by Ms. Cahall are kept in large bins in her classroom and are not prominently displayed in her classroom; to ascertain the title or subject manner of any particular book one must physically go through the bins and individually review each book (RE 1, *Complaint*, ¶ 43, Page ID # 11);

- Four of the books that Ms. Cahall maintained in her classroom in the bins with all of the other books had characters in them that identify as LGBTQ+. None of the four books advocated for or against any particular lifestyle; none were obscene, and none described sexual contact or activity (RE 1, *Complaint*, ¶ 44-47, Page ID # 11);

- Ms. Cahall did not prominently display these specific books in her classroom, did not teach from these books as part of her instructional program, and did not require students to read from these books (RE 1, *Complaint*, ¶10, 60, Page ID # 4-5, 14);

- Ms. Cahall had originally obtained the four disputed books following a dispute in the New Richmond district in 2020-2021 over whether teachers should be permitted to display "rainbow stickers" on their nametags, laptop cases or desk nameplates, to show that they were safe for LGBTQ+ students to confide in or seek advice from (RE 1, *Complaint*, ¶ 27-33, Page ID # 8-9);

- Ms. Cahall obtained the books after her personal research revealed that, compared to their peers, a statistically higher percentage of LGBTQ+ youth had reported symptoms of anxiety, depression, had considered suicide, experienced difficulty and had experienced delay in obtaining mental health care due to anti-LGBTQ+ stigma, family and peer rejection and discrimination (RE 1, *Complaint*, ¶ 38-40, Page ID # 10);

- After learning about these specific books, Ms. Cahall viewed them as reinforcing her sincerely moral and religious beliefs that all children, including children who are LGBTQ+ of the children of LGBTQ+ parents, deserve to be respected, accepted and loved for who they are, felt that the books could serve as a positive tool to promote those values to any LGBTQ+ student who might come to her for guidance or support and included them in her classroom library (RE 1, *Complaint*, ¶ 48-49, Page ID # 12-13);

- During Ms. Cahall's employment with New Richmond, the District has allowed its teachers and employees to engage in religious activity by permitting them to wear religious insignia and symbols in the presence of other students, allowed a teacher to prominently display a sign in her classroom stating "He is for you" in reference to Jesus Christ and has allowed teachers to use District-maintained resources, such as District email accounts, to promote religious-based events such as a prayer service in Ms. Cahall's school building prior to the start of the school year called "Blessing of Monroe" and an activity known as "Samaritan's Purse" that distributed items to children on over 170 countries along with a Bible storybook translated into the language of the child receiving it (RE 1, *Complaint*, ¶ 50-53, Page ID # 12-13; RE 17-1 and 17-4, *Proposed Amended Complaint*, ¶ 53, Page ID # 160, 181);

- Then District has a book entitled "Boy Crazy Stacey" in the elementary school library, the cover of which could be viewed inappropriate for an elementary school library (RE 17-1 and 17-3, *Proposed Amended Complaint and Jury Demand* at ¶ 51, Page ID # 160, 180);

- The District has books from the "Captain Underpants" series in the Monroe school library that also feature a gay character (RE 17-1 and 17-2, *Proposed Amended Complaint* at ¶ 50, Page ID # 159, 175);

- On or about October 30, 024, Kayla Shaw, whose child is a student in Ms. Cahall's class, made an email complaint to New Richmond regarding the presence of the disputed books in Ms. Cahall's classroom (RE 1, *Complaint*, ¶ 55-56, Page ID # 13);

- Upon receipt of Ms. Shaw's complaint, appellee Miller directed Ms. Cahall to appear for a pre-disciplinary hearing on November 4, 2024, regarding the books (RE 1, *Complaint*, ¶ 57, Page ID # 13);

6

- Ms. Cahall complied with the directive to appear at the pre-disciplinary hearing and at that hearing explained her reasons for maintaining the disputed books in her classroom library, including her sincerely held religious beliefs for doing so (RE 1, *Complaint*, ¶ 58-60, Page ID # 14);

- On November 6, 2024, appellee Miller suspended Ms. Cahall for three days without pay for having the disputed books in her classroom (RE 1, *Complaint*, ¶ 61, Complaint Exhibit 2, Page ID # 14, 29-30);

- In the suspension notice, appellee Miller specifically stated that Ms. Cahall's understanding of "the values that many hold" in the New Richmond community "should have informed [her] of the controversial nature of some of the topics in these books." (RE 1. *Complaint*, ¶ 61, Complaint Exhibit 2, Page ID # 29);

- Appellee Miller made no findings that Ms. Cahall used the disputed books as part of her instructional program, that she initiated discussion regarding the books with any students, that she used the books to indoctrinate students or endorse an LGBTQ+ lifestyle, or that she prominently displayed any of the books in her classroom (RE 1, *Complaint*, ¶ 62-63, Page ID # 14); and

- The suspension notice explicitly threatened Ms. Cahall with further discipline, including termination, for any further alleged violations of Board Policy 2240 (RE 1, *Complaint*, ¶ 61, *Complaint* Exhibit 2, Page ID # 29).

## <u>SUMMARY OF THE ARGUMENT</u>

The *sine qua non* of the Due Process Clause of the Fourteenth Amendment and the "void for vagueness" doctrine is that a law or governmental regulation provide fair notice of the standard of conduct to which a citizen is held accountable and that it not leave the definition of its operative terms to those in charge of enforcement, thus inviting arbitrary, discriminatory and overzealous enforcement.

7

Board Policy 2240 violates these fundamental requirements by failing to meaningfully define what constitutes a "controversial issue" or an "instructional program" in such a manner that a reasonable educator is on notice as to what Board Policy 2240 permits or prohibits. Nor does Board Policy 2240 set forth any reasonably articulable guidance to those charged with enforcing it as to what is or is not ":controversial" and how to implement and enforce it in an objective manner and avoid arbitrary, discriminatory and overzealous enforcement.

Board Policy 2240's failure to define what constitutes an "instructional program" is particularly problematic in this case because it is not disputed at the pleadings stage that Ms. Cahall did not teach from any of the disputed books or discuss them in  class – they simply sat in a series of large bins intermingled with roughly 100 other books covering a multitude of topics.

As drafted, Board Policy 2240 gives unfettered discretion to those tasked with enforcing it and invites arbitrary, discriminatory and overzealous enforcement, Board Policy 2240 is silent as to what – if any – discipline is appropriate for violations of the policy. This is compounded by the fact that Board Policy 2240 does not categorically prohibit the introduction of "controversial issues" in the classroom – or for that matter any specific and readily identifiable issue. To the contrary – Board Policy 2240 expressly recognizes the educational value that the discussion of so-called "controversial issues" can have and allows teachers to voice their personal

8

opinion on a "controversial issue" if it comes up in discussion. This too only serves to create further confusion for teachers as to what is or is not permissible under Board Policy 2240. This is compounded yet even further by the absence of a scienter requirement which has the effect of allowing for unknowing or inadvertent violations to be disciplined.

The absence of any articulable standard for determining whether simply maintaining a book featuring an LGBTQ+ character implicated the "controversial issues" policy and the lack of any articulable standard for determining whether simply maintaining a book make it part of an "instructional program" when it is not used in classroom instruction exacerbated the violation of Ms. Cahall's due process rights. Lacking any discernable guidelines, appellee Miller violated Ms. Cahall's due process rights when he resorted to the equally undefinable and highly subjective "values of the community" as justification for discipling her for allegedly violating Board Policy 2240. Reliance upon subjective "values of the community" as a basis for discipline is precisely what the due process clause forbids.

## ARGUMENT

### I.  Standard of Review

This Court reviews *de novo* the district court's dismissal of Ms. Cahall's complaint. See generally *Majestic Building Maintenance, Inc. v. Huntington Bancshares, Inc.*, 864 F.3rd 455, 458 (6th Cir. 2017). In doing so, this Court must

construe the complaint in the light most favorable to Ms. Cahall, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of Ms. Cahall. *Courtright v. City of Battle Creek*, 839 F.3rd 513, 518 (6th Cir. 2016). To survive a dismissal, Ms. Cahall's complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This Court also reviews *de novo* the District Court's denial of leave to amend the complaint on futility grounds. *Williams v. City of Cleveland*, 771 F.3rd 945, 949 (6th Cir. 2014). While denials of leave to amend a pleading are usually subject to an abuse of discretion standard, *Williams* held that the abuse of discretion standard does not apply when leave is denied on futility grounds. Rather, *Williams* held that *de novo* review is applied because the ultimate ***legal*** issue is whether the proposed amendment would withstand a motion to dismiss.

II.    **New Richmond Board Policy 2240 Is Facially Void For Vagueness Under The Fourteenth Amendment Substantive Due Process Clause And Is Unconstitutional As Applied To Ms. Cahall's Suspension.**

A.    **The "Void For Vagueness" Doctrine**

At the crux of the Due Process "void got vagueness" doctrine is the right of citizens to know with clarity what the law allows and what it does not allow. "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou*

*v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 452 (1939)).  Those subject to a law must be able to understand it so that they may conform with it, and a law that cannot be understood is no law at all. *United States v. Davis*, 588 U.S. 445, 447 (2019); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Citizens – including public school teachers – are thus entitled to laws and regulations that are of sufficient clarity that they leave no room for arbitrary or discriminatory enforcement by judges and other public officials (including superintendents of public-school districts).  As Justice Gorsuch aptly observed in his concurrence in *Sessions v. Dimaya*, 584 U.S. 148, 175 (2018), vague laws "can invite the exercise of arbitrary power *** by leaving people in the dark about what the law demands and allowing prosecutors and courts to make it up."  This is what is alleged in the complaint and proposed amended complaint to have happened in this case.

The "void for vagueness" doctrine is well defined.  This Court has summarized the doctrine as follows:

> Vagueness may take two forms, both of which result in a denial of due process.  A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable.  At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Dambrot v. Central Michigan University*, 55 F.3rd 1177, 1183-1184 (6th Cir. 1995).

11

This Court has further stated:

> In pursuing a void-for-vagueness claim, a plaintiff must establish to a court's satisfaction that "[a regulation's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *** The void-for-vagueness doctrine not only ensures that laws provide "fair warning" of proscribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *** Without "clear standards guiding the discretion of public officials" with enforcement authority, there is a risk that those officials will "administer the policy based on impermissible factors." *** As a result, laws or regulations that, for example, give officials "unbridled discretion over a forum's use" are impermissible because of the "danger of censorship and of abridgement of our precious First Amendment freedoms." ***  A statute that fails to constrain "an official's decision to limit speech" with "objective criteria" is unconstitutionally vague.

*Miller v. City of Cincinnati*, 622 F.3rd 524, 539 (6th Cir. 2010) (citations omitted).

The constitutional prohibition against vague laws applies in the civil context as well as the criminal context.  See, e.g., *Boutilier v. INS*, 387 U.S. 118, 123 (1967); *Shuti v. Lynch*, 828 F.3rd 440, 445 (6th Cir. 2016).[3]  The constitutional prohibition against vagueness also applies in the educational context and restrictions on what teachers can and cannot teach in their classrooms.  See, e.g., *Epperson v. Arkansas*,

---

[3]    As Justice Gorsuch aptly observed in his concurring opinion in *Dimaya,* "[o]urs is a world filled with more and more civil laws bearing more and more extravagant punishments *** including remedies that strip persons of their professional licenses and livelihoods."  584 U.S. at 184.  "[I]n the criminal context this Court has generally insisted that the law must afford 'ordinary people *** fair notice of the conduct it punishes' *** [a]nd I cannot see how the Due Process Clause might often require any less than that in the civil context either."  584 U.S. at 183.

393 U.S. 97, 102-103 (1968) (observing that the "infinite varieties of communication embraced within the term 'teaching'" can render the term vague).

As it pertains to the specific language of Board Policy 2240, this Court has cautioned that use of the term "controversial" to define what is or is not permissible implicates the "void for vagueness" doctrine because it "vests the decision-maker with an impermissible degree of discretion." *United Food & Commercial Workers Union, Local 1009 v. Southwest Ohio Regional Transit Authority*, 163 F.3rd 341, 359 (6th Cir. 1998).

This Court has also emphasized a crucial distinction between the notice requirements and the necessary enforcement constraints and has stated that the latter is perhaps of even more importance than the former:

> The requirement that the government write statutes that provide fair notice to those who must obey them is a traditional basis of the vagueness doctrine.  "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  ***  The requirement of fair notice is not applied mechanically or without regard for the common sense judgment that people do not review copies of every law passed.

> The second concern, that of minimal enforcement standards, is related to the first.  While the first involves notice to those charged with obeying the law, the second part relates to notice to those who must enforce the law, be they the police, judges, or juries.  The standards of enforcement must be precise enough to avoid "involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result."  ***

13

> As a practical matter, the Supreme Court considers the latter concern the most important.  This reflects the common sense understanding that the average citizen does not read, at his leisure, every federal, state, and local statute to which he is subject.  ***

*Columbia Natural Resources v. Tatum*, 58 F.3rd 1101, 1105 (6th Cir. 1995) (citations omitted).

### B.    Board Policy 2240 Need Not Be "Vague In All Applications" To Be Unconstitutional

Relying principally upon *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489 (1975), the District Court determined that Board Policy 2240 survived the facial challenge to its constitutionality because it is not "vague in all applications" (RE 25, *Opinion and Order*, at 16-17, Page ID # 321-322).  See also *United States v. Salerno*, 681 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").

This was error.  In its more receipt opinions on this issue, the Supreme Court has expressly backed off from the rigidity of *Hoffman Estates* and *Salerno* and held that a law may be facially invalid "even when it could conceivably have had some valid application."  *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983) (citing *Colautti v. Franklin*, 429 U.S, 379, 394-401 (1979)); *Lanzetta,* , 306 US. at 453.

14

In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court made this clear when it unambiguously stated that "although statements in some of our opinions could be read to suggest otherwise, our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 502.  Cf. *Davis*, 588 U.S. at 447-448 ("In our constitutional order, a vague law is no law at all"); *Dimaya*, 584 U.S. at 159, n. 3 (quoting *Johnson*, supra).

Multiple lower courts have interpreted these decisions as categorically rejecting the "vague in all applications" standard relied upon by the District Court and espoused by the appellees.  See, e.g., *Young Israel of Tampa, Inc. v. Hillsborough Area Regional Transit Authority*, 89 F.4th 1337, 1359-50 (11th Cir. 2024) ("in its more recent cases the Supreme Court has cut back on the broad statement in *Salerno*, at least when vagueness is the constitutional vice"); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781-782 (5th Cir. 2023) ("the Supreme Court has now twice clarified that 'although statements in some of [its] opinions could be read to suggest otherwise,' the Court's 'holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp'"); *United States v. Cook*, 914 F.3rd 545, 553 (7th Cir. 2019) ("*Johnson* puts to rest the notion – found in any number of pre-*Johnson* cases – that a litigant must show that the statute in question is vague in all of its

applications in order to successfully mount a facial challenge"); *Guerro v. Whitaker*, 908 F.3rd 541, 544 (9th Cir. 2018) ("*Johnson* and *Dimaya* expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope"). Accordingly, Ms. Cahall was not required to demonstrate that Board Policy 2240 is vague in all applications to prevail on her facial and as-applied constitutional challenges.

C.  **Board Policy 2240 Warrants Strict Scrutiny Review Because It Is Punitive and Implicates First Amendment Rights**

Also at issue is the level of scrutiny that should be applied to Board Policy 2240. This Court should employ heightened scrutiny in evaluating the constitutionality of Board Policy 2240 because it is punitive in nature, has a stigmatizing effect where sanctions are a matter of public record and infringes on protected First Amendment free-speech and free exercise rights.

In *Dimaya*, the Supreme Court rejected the notion that a less stringent standard should apply in civil cases. *Dimaya*, 584 U.S. at 156-175. Given the potentially "grave nature of deportation" at issue in *Dimaya*, the Supreme Court reasoned that the same standard of certainty required of criminal laws should apply in the civil removal context. *Dimaya*, 584 U.S. at 157. Accord *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966) (rejecting any distinction between civil and criminal penalties in vagueness analysis and noting that the due process protection "is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute").

This rationale is equally applicable in this case. While appellees chose to characterize Board Policy 2240 as a mere "work rule" (RE 12, *Motion for Judgment on the Pleadings*, at 2, 10-12, Page ID # 54, 62-64), the facts of this case show that the consequences for purported violations of Board Policy 2240 are similarly "grave" to educators and thus implicate strict due process protection no matter how the appellees choose to characterize it. Board Policy 2240 is facially silent as to the potential consequences for violations and as to the criteria to be applied in determining punishment for violating Board Policy 2240 – giving enforcement officials like appellee Miller unfettered discretion in how to enforce it. Ms. Cahall was not reprimanded or counselled for her alleged violation of Board Policy 2240 – she was suspended for three days without pay and threatened with termination (RE 1, *Complaint*, ¶ 61, *Complaint* Exhibit 2, Page ID # 29).[4] This discipline is a matter of public record. Ms. Cahall is a public employee and public employee disciplinary records in Ohio are public records as a matter of law. See Ohio Rev. Code § 149.43; *State, ex rel., Multimedia, Inc. v. Snowdon*, 72 Ohio St. 3rd 141, 143 (1995). The

---

[4] The absence of any such guidelines raises the question of whether any discipline was even required. There is no language in Board Policy 2240 that mandated an unpaid three-day suspension. There is no language in Board Policy 2240 that would have foreclosed verbal counselling as discipline – if discipline was even required. There is no language in Board Policy 2240 that would have precluded appellee Miller from simply requesting that Ms. Cahall either remove the books from the bins, place them somewhere else in her classroom not readily accessible to students, or that she not allow access to any student whose parents so requested.

public nature of such discipline is stigmatizing and adverse to an educator's livelihood.  Appellees cannot argue otherwise.

The lack of any meaningful guidance as to what constitutes a violation of Board Policy 2240 and as to what the sanction is for violating it – coupled with the public nature of any *post hoc* discipline for violating Board Policy 2240 – is precisely what *Dimaya* speaks to and is precisely what demands the most exacting vagueness review by this Court.  Cf. *Manning v. Caldwell*, 930 F.3rd 264, 273 (4th Cir. 2019) (*en banc*) ("even laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect); *Ridley v. Massachusetts Bay Transportation Authority*, 390 F.3rd 65, 95-96 (1st Cir. 2004) (recognizing that "vagueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation").  It is respectfully submitted that discipline that becomes a matter of public record and is accompanied by an express threat of termination is fundamentally no different.

The highest level of scrutiny is warranted in this case because the plain language of Board Policy 2240 also impacts protected First Amendment free speech and free exercise rights.  A heightened level of scrutiny is necessary in this case because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."

*Grayned*, 408 U.S. at 109.  Board Policy 2240 expressly recognizes the educational value of discussing "controversial issues" in as classroom setting and further permits teachers to express their personal opinion on those issues.  Appellees have never disputed that this allowance in Board Policy 2240 is subject to the protections of the First Amendment.

More significantly, protected religious expression is at issue in this case.  Ms. Cahall alleges in this case that she maintained the books in her classroom library in furtherance of her sincerely moral and religious beliefs that all children, including children who are LGBTQ+ of the children of LGBTQ+ parents, deserve to be respected, accepted and loved for who they are, felt that the books could serve as a positive tool to promote those values to any LGBTQ+ student who might come to her for guidance or support and included them in her classroom library (RE 1, *Complaint*, ¶ 48-49, Page ID # 12-13).  She further alleges that she informed appellee Miller of this at her pre-disciplinary hearing (RE 1, *Complaint*, ¶ 58-60, Page ID # 14).

These are factual allegations that must be taken as true at this state of the litigation.  Also to be taken as true at this stage are the allegations in the complaint and the proposed amended complaint that other teachers and personnel within the District have been allowed to engage in similar religious expression that would also be subject to First Amendment protection.  Specifically, the complaint and amended

complaint allege that teachers and employees are permitted to wear religious insignia and symbols in the presence of other students. One teacher displayed a sign in her classroom stating "He is for you" in reference to Jesus Christ (RE 17-4, Page ID # 181). Teachers have been permitted to use District-maintained resources, including email accounts, to promote religious-based events such as a prayer service in Ms. Cahall's school building prior to the start of the school year called "Blessing of Monroe" and an activity known as "Samaritan's Purse" that distributed items to children on over 170 countries along with a Bible storybook translated into the language of the child receiving it (RE 1, *Complaint*, ¶ 50-53, Page ID # 12-13; RE 17-1 and 17-4, *Proposed Amended Complaint*, ¶ 53, Page ID # 160, 181). Yet this activity does not run afoul of Board Policy 2240 whereas Ms. Cahall's expression of her own religious beliefs does even though she did not engage in it the presence of students. This too highlights the lack of any workable standard as to what is or is not controversial under Board Policy 2240. In this regard, Board Policy 2240 also clearly impacts protected religious expression[5] within the broader context of what is

---

[5] It is well established that governmental entities such as school districts must treat differing religious views equally and must maintain neutrality. See, e.g., *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018). As such, and to the extent that Board Policy 2240 reaches issues that intersect with religious issues, the District must maintain neutrality in interpreting and applying Board Policy 2240.

or is not ":controversial: under Board Policy 2240. As such, heightened scrutiny is appropriate in this case.

**D.** **New Richmond Board Policy 2240 Is Unconstitutionally Vague**

1. Board Policy 2240 Fails To Give A Person Of Ordinary Intelligence A Reasonable Opportunity To Know What Is Prohibited And What Is Not So That They May Act Accordingly

Board Policy 2240's vagueness is readily apparent from its use of the term "controversial" to define what is and is not permissible – a term that this Court has previously held specifically implicates the "void for vagueness" doctrine because it "vests the decision-maker with an impermissible degree of discretion." *United Food & Commercial Workers Union, Local 1009*, 163 F.3rd at 359. Board Policy 2240 only defines "controversial" as something that two people might disagree about. But the reality is that two people can disagree on virtually anything for any reason – valid or invalid. What one person may find "controversial" might not be to someone else. Cf. *Dambrot*, 55 F.3rd at 1184 ("in order to determine what conduct will be considered "negative" or "offensive" [under a university conduct policy] one must make a subjective reference. Though some statements might be seen as universally offensive, different people find different things offensive").

Board Policy 2240 makes no effort to provider any definition or clarity to what is "controversial" that would guide an educator of reasonable intelligence as to what

21

is prohibited.  Board Policy makes no effort to clarify what is or is not "controversial" based upon subject matter.  Board Policy 2240 makes no effort to clarify whether "controversial" is limited to so-called "hot button" political, social, moral or religious issues or – if it does – what specific issues are or are not within the definition of "controversial."  The policy's definition of "controversial" casts such a wide and all-encompassing net that no educator can reasonably know what is or is not ensnared within its vague definition.

Multiple decisions from multiple courts in just the past few years illustrate the constitutional roadblocks that are inherent in similar efforts to limit the teaching or introduction of "controversial" or "divisive" issues in public schools.  Granted – these Courts all recognized and upheld the ***right*** of states and school districts to regulate the speech of their teachers in the performance of their teaching duties.  These courts all still found that those attempts did not meet constitutional due process requirements because the ***manner*** in which they did so was insufficient to place those teachers on notice as to what was or was not permissible.

In *Tennessee Educational Association v. Reynolds*, 732 F.Supp. 3rd 783 (M.D. Tenn. 2024), *vacated on other grounds*, Case No. 3:23-CV-751 (M.D. Tenn, April 17, 2025),[6] the District Court addressed a series of statutory enactments that

---

[6]    *Reynolds* was ultimately dismissed without prejudice on standing grounds.  The dismissal should not, however, detract from the persuasive value of the District Court's well-reasoned decision denying the initial motion to dismiss.

22

prohibited public school teachers from "including" or "promoting" certain concepts in the classroom, including that "[Tennessee] or the United States is fundamentally or irredeemably  racist or sexist" or the idea of "ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex."  Enforcement and implementation rules included in the enactments and in subsequent regulations implemented by the Tennessee Department of Education required investigation of any complaint from a wide array of "eligible complainants" which could lead to a wide variety of penalties, including teacher discipline and/or the withholding of funding from a school system. *Reynolds*, 732 F.Supp. 3rd at 793-799.

The *Reynolds* plaintiffs alleged that the enactments and implementing regulations were void for vagueness and therefore violated the Fourteenth Amendment's due process clause.  The defendants filed a motion to dismiss, which the District Court denied.  After acknowledging the right of the Tennessee to regulate the speech of its teachers in the performance of their teaching duties, *Reynolds*, 732 F.Supp. 3rd at 807, n. 15, the District Court explained why the statutes were unconstitutionally vague:

> Given that it is possible for an ordinary civil law to be impermissibly vague, the Act — or, at least, a substantial portion of it — obviously

_____

The decision is fundamentally consistent with precedent from this Court and the Supreme Court and other District Courts addressing similar laws under the "void for vagueness" doctrine.

23

poses that risk. Indeed, the defendants have not identified any enforceable prohibitory civil law, in Tennessee or any other U.S. jurisdiction, that is less clear in its directives than the Act. The defendants protest that difficult edge cases may arise under many statutes, and that does not render those statutes necessarily unconstitutional. That is true, but it is beside the point. As the Supreme Court has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine" whether a violation has occurred, "but rather the indeterminacy of precisely what" standard the law imposes for finding a violation in the first place. \*\*\*. ***_The Court has recognized that that danger is particularly strong when a statute uses terms incorporating "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings._***" \*\*\* That is exactly what has happened here.

The Act does not simply use language that is sloppy or overly general; ***_the entire Act is built around unrestrained appeals to abstract principles with contestable moral and political content — such that the practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it_***. Every or nearly every concept prohibited by the Act is poorly defined in that way, set out in language that might be at home in an angered blog post or an opinion column but which, when imported into a legal code, is manifestly unworkable. What, for example, does it mean to "promote" the concept that Tennessee or the United States is "fundamentally or irredeemably racist or sexist"? What is the difference between ascribing a trait to a nation/state and ascribing that trait to the nation/state's institutions, leaders, or history? What separates a "fundamental" trait from a non-fundamental one? What does it mean for such a flaw to be "irredeemable"? All of those issues arise before one even reaches the main event: the meaning of the terms "racist" and "sexist." Anyone who lives in the United States should know that one could fill a library with the disagreements about the meaning of those terms that happen in a single day.

*Reynolds*, 732 F.Supp.3rd at 807 (emphasis added). The District Court summed it up by aptly stating that "the government cannot simply tell people to 'be good' and leave it up to the enforcers to decide what 'good' is." *Reynolds*, 732

F.Supp. 3rd at 808.  The apt analogy to this case is that "the government cannot simply tell a teacher not to say something 'controversial' and then leave it up to the enforcers to decide after the fact what 'controversial' is."

A similar challenge was presented in *Local 8027, AFL-CIO v. Edelblut*, 651 F.Supp. 3rd 444 (D. N.H. 2023) ("*Edelblut I*).  In *Edelblut*, plaintiffs challenged on multiple grounds a series of enactments in New Hampshire that sought to limit what teachers could teach on "divisive matters."   Similar in concept to the Tennessee enactments at issue in *Reynolds*, these enactments stated that primary or secondary students in the state's public schools could not be "taught, instructed, inculcated or compelled to express belief in, or support for" the idea that one is not "inherently superior" to another because of any particular characteristic, that anyone is inherently biased against another because of any particular characteristic, or that anyone should be treated differently because of any particular characteristic. Multiple enforcement mechanisms were also enacted.   The New Hampshire Attorney General or any other person "claiming to be aggrieved by a violation" of the prohibitions could seek damages and injunctive relief through the state courts. Violations could also lead to sanctions through the New Hampshire State Board of Education in the form of suspension or revocation of an educator's certification, as well as a reprimand.  *Edelblut I*, 444 F.Supp. 3rd at 447-448.

Several groups challenged the statutes on First Amendment freedom of speech grounds and "void for vagueness" grounds.  A Motion to Dismiss was filed.  The District Court rejected the teachers' First Amendment claim to the extent that it related to the curricular speech of primary and secondary teachers, *Edelblut I*, 444 F.Supp. 3rd at 450-454, but allowed the void for vagueness claim to proceed.

Central to the Court's analysis was the lack of a scienter requirement in the statutory enactment.  Even though the statutory enactment fairly described what was considered to be a "divisive concept," the District Court held that because of the absence of a scienter requirement in the statutes, "inadvertent statements that are later deemed to advocate a banned concept can violate the [statutory enactment]." *Edelblut I*, 444 F.Supp. 3rd at 460.  The District Court elaborated:

> Defendants argue that they should prevail even under this standard because the education and antidiscrimination amendments provide adequate notice and sufficient enforcement guidelines.  I disagree. Although the amendments identify certain core concepts that may not be taught, they do not give either teachers or enforcers the guidance they need to find the line between what the amendments prohibit and what they permit.  This is so especially because the amendments allow teachers to be sanctioned for speech that advocates a banned concept only by implication.
>
> In addition to express advocacy, the AG has opined that the amendments can be violated by conduct that merely implies the truthfulness of a banned concept. *** For example, the opinion states that a public employer could violate the amendments if it creates a web-based anti-racist resource and states that it was designed to "serve as a resource for our white employees" *** According to the AG, this conduct could violate the amendments because it "may imply that white people, specifically and for no other reason, are in need of anti-racist

26

resources" ***.  In other words, a teacher could unknowingly violate the amendments by making a statement that does not expressly endorse a banned concept but that could be understood to imply it.  Coupled with the enforcing agencies' view that the amendments are not limited to curricular speech but also governs teachers' conduct during extracurricular activities, this statutory construction leaves open countless applications where a teacher does not directly assert a banned concept but, in the view of an enforcer, implies its correctness.

*Edelblut I*, 444 F.Supp. 3rd at 461.

Based on these and other related concerns, the District Court declined to dismiss the plaintiffs' due process claims.  The District Court reaffirmed its findings when it subsequently granted summary judgment to the plaintiffs and struck down the statutory scheme on due process grounds, *Local 8027, AFL-CIO v. Edelblut*, Case No. 21-CV-1077 (D. N.H. May 28, 2024) (*Edelblut II*), concluding that "the Amendments are viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement."

A similar conclusion was reached in a challenge to statutory enactments in Oklahoma.  In a pair of reported decisions, a District Court found that portions of Oklahoma's statute stating that public K-12 schools and universities shall not "require or make part of a course" certain concepts related to race or sex violated the Due Process Clause.  *Black Emergency Response Team v. Drummond*, 737 F.Supp. 3rd 1136 (W.D. Ok. 2024) (*Drummond I*); *Black Emergency Response Team v. Drummond*, 737 F.Supp. 3rd 1158 (W.D. Ok. 2024) (*Drummond II*).  The District

27

Court took issue with several provisions of the statute applicable to K-12 public schools.  One provision that District Court invalidated provided that "no [school personnel] shall *** make part of a course the *** concept[] *** members of one race or sex cannot and should not attempt to treat others without respect to race or sex ***."  The Court was concerned that although this particular provision would prohibit the teaching of ideas that had already been widely rejected (i.e., that it is acceptable to restrict access to public accommodations based upon race) but would prohibit a teacher from including in a course ideas that are the subject of current political debate (such as affirmative action or the consideration of race or gender in college admissions).  Based upon this ambiguity the District Court found that "there is a strong likelihood that Plaintiff will be able to show that [this provision] does not provide fair notice to school administrators and teachers as to what is prohibited *** and what is not and, therefore, [the provision] is impermissibly vague in violation of the Fourteenth Amendment." *Drummond I*, 737 F.Supp. 3rd at 1152.

The District Court also took issue with a provision that stated that "no [school personnel] shall *** make part of a course the *** concept[] *** members of one race or sex cannot and should not attempt to treat others without respect to race or sex ***."  The District Court noted that while this provision would prohibit the teaching of ideas that had been widely rejected (such as that children should be judged by the color of their skin and not the content of their character) it too would

equally appear to prohibit other ideas that are also the subject of current political debate or reflected in current law (such as whether separate sports divisions should be established for boys and girls). This ambiguity also resulted in the Court determining that it was impermissibly vague. *Drummond I*, 737 F.Supp. 3rd at 1152-1153.

Additionally, two recent District Court decisions granted preliminary injunctions against enforcement of a "Dear Colleague" letter issued by the United States Department of Education that directed federally-funded educational institutions to cease all racially discriminatory and unlawful "DEI" (diversity, equity and inclusion) programs on the legal grounds that the "Dear Colleague" letter was unconstitutionally vague and likely violated due process. In *NAACP v. Department of Education*, 779 F.Supp. 3rd 53 (D. D.C. 2025) the District Court enjoined the directive on basis that "although the challenged documents place a particular emphasis on 'certain DEI practices,' they fail to provide an actionable definition of what constitutes 'DEI' or a 'DEI' practice, or delineate between a lawful DEI practice or an unlawful one". Similarly, in *National Education Association v. Department of Education*, 779 F.Supp. 3rd 149 (D. N.H. 2025) the District Court enjoined the directive on basis that "to label a program as a 'diversity, equity, and inclusion' program necessarily involves 'appeals to abstract principles *** such that the practical meaning of the [Letter] must, by definition, depend in significant part

on the political, social, and moral assumptions of the party enforcing it'" (quoting *Reynolds*, 732 F.Supp. 3rd at 807).

If there is any meaningful distinction between Board Policy 2240 and the policies at issue in these cases, it is that the drafters of the legislation and policies at issue in those cases at least made an effort to identify with some specificity what concepts could not be taught in the schools in those jurisdictions. While those efforts were insufficient to save the legislation in *Reynolds* and *Edelblut*, it was successful as to some of the enactments at issue in *Drummond* – illustrating the high degree of specificity that is necessary to meet the notice requirements imposed by the due process clause outlined herein.

Board Policy 2240 makes no such effort and is even substantially vaguer than the policies at issue in these cases. There simply is nothing in the plain language of Board Policy 2240 that would place a person of ordinary intelligence on notice as to what is or is not "controversial" or that would guide the individual(s) in charge of enforcing it as to how to do so in a manner that does not invite arbitrary or discriminatory enforcement.

The reality is that a New Richmond teacher could bring virtually any book or material into his or her classroom and risk it being determined "controversial" for one subjective reason or another. In briefing to the District Court, two examples were provided that illustrate how teachers can get caught in this "Catch-22." For

30

example, a teacher could place a book in his or her classroom library that features children of different races or ethnicities who are friends that have bonded over a love of sports. The teacher might view the book as promoting the enjoyment of participating in sports, promoting being a good teammate or promoting good sportsmanship – all certainly values worthy of promotion even at a third-grade level. However, a parent could complain (fairly or unfairly) that the book is "controversial" because they believe it somehow implies that children who do not have friends of a different race or ethnicity are inherently racist or that that they need to have friends of other races or ethnicities in order to not be perceived as racist. Would the teacher who puts that book in his or her classroom library be accused of "indoctrination by implication" simply for having the book? There simply is no guidance in Board Policy 2240 to guide that teacher in determining whether that book would be prohibited under Board Policy 2240. Nor is there any language in Board Policy 2240 to ensure that any administrator tasked with applying Board Policy 2240 in response to any such complaint does so in a matter that is objective and free from "the attendant dangers of arbitrary and discriminatory application" *Miller*, 622 F.3rd at 529.

What about a book that features a Jewish child who excels at playing the violin and gives an amazing performance at a Hanukkah celebration? Certainly fostering a love and appreciation of music and developing musical talent is worthy of

31

promotion – even at a third-grade level. But could a teacher who puts that book in his or her classroom library be accused by a parent of implicitly endorsing Judaism over Christianity? What if the child in the book was a Muslim?

There are no guidelines are in place to ensure administrators do not order the removal of such books as "controversial" in response to a parent complaint based simply upon the subjective beliefs of whomever responds to the parent's complaint. There simply is no language in Board Policy 2240 that operates to protect teachers from allegations of "indoctrination by implication" that the District Court in *Edelblut* warned about, and nothing to guide those charged with enforcing Board Policy 2240 to do so in a manner that is not arbitrary and/or discriminatory – as *Reynolds* warned about.

        2.    <u>Board Policy 2240 Is Vague As To What Constitutes An</u>
                <u>"Instructional Program"</u>

Board Policy 2240 is also constitutionally defective in that it fails to define what an "instructional program" is. Board Policy 2240 makes repeated references to the phrase "instructional program" in ins text but nowhere indicates what that phrase means.

One can easily define "instructional program" to mean a set curriculum that teachers actively teach to their students in a classroom. If this were to be considered the definition of an "instructional program," it would not apply in this case because it is undisputed that Ms. Cahall did not actively teach from these books as part of

her instructional program and did not require students to read from these books (RE 1, *Complaint*, ¶10, 60, Page ID # 4-5, 14).  One could also construe the "ordinary meaning" of an "instructional program" to include the passive display of visual aids in a classroom – such as the alphabet displayed across the top of a chalkboard, a map or set of maps, or the periodic table of elements.  Again – that would not apply in this case because it is also undisputed that Ms. Cahall did not prominently display these specific books in her classroom.  To ascertain the title or subject manner of any particular book one would have to physically go through the bins they were kept in and individually review each book (RE 1, *Complaint*, ¶ 43, Page ID # 11).  Appellees chose not to define "instructional program" in enacting Board Policy 2240, leaving such interpretive decisions it to those tasked with implementing it and enforcing it – itself a sign of unconstitutional vagueness.

Again – this lack of clarity puts educators in a Catch-22.  Nothing in the language of Board Policy 2240 even remotely suggests that simply having something in a classroom that is not visibly displayed and is neither actively nor passively used with students is "instructional" or constitutes an "instructional program" – yet this is how it was applied in Ms. Cahall's situation.   As previously noted, the Supreme Court has observed that the "infinite varieties of communication embraced within the term 'teaching'" can render the term vague.  *Epperson*, 393 U.S. at 102-103.  Accord *Keyishian v. Board of Regents of the State University of*

33

*New York*, 385 U.S. 589, 599-600 (1967) (holding that regulations that prohibited the employment of an instructor who "advocates, advises or teaches the [prohibited[ doctrine" were impermissibly vague  because they "may very well [reach] one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others"); *Ozonoff v. Berzak*, 744 F.2nd 224, 232 (1st Cir. 1984) (holding that language in executive order prohibiting "advocacy" of "treason and sedition" was vague when it was unclear whether the language applied to protected speech).   The term "instruction" or "instructional program" in Board Policy 2240 suffers the same defects and is unconstitutionally vague on its face and as it was applied to Ms. Cahall.

      3.      <u>Appellee Miller's Reliance Upon "Community Values" To Determine What Is "Controversial" Is Too Vague And Subjective To Satisfy Due Process</u>

Precedent is clear that to survive a due process challenge under the "void for vagueness" doctrine, a challenged provision must contain "clear standards guiding the discretion of public officials" with enforcement authority so that they do not "administer the policy based on impermissible factors."  *Miller*, 622 F.3rd at 539.  It is submitted that allowing reliance on undefined and undefinable "values of the community" – as appellee Miller did in his disciplinary notice to Ms. Cahall – simply does not meet that requirement.  What it does is beg the unanswerable question of "whose values" are considered the "values of the community," how are those "values

of the community" determined and who gets to decide what the "values of the community" are? What – if any – weight is to be given to the "values" of others in the community? Are they simply irrelevant?

"Community" is not a homogenous concept. A "community" is comprised of individuals – each of whom bring to the table their own divergent opinions, attitudes and biases. It does not imply any type of consensus as to what the community's "values" are. "Community" members will inevitably vary in the degree to which they promote their values within their "community" – some may be politically active and willing to use their position in the community as a platform to advance their own values and/or denounce the values of others. They may do it by seeking office or in aiding others seeking political office. They may do it from the pulpit through religious organizations. They may simply speak their mind to anyone who is within earshot. Conversely, they may simply keep quiet. All of this – of course – is consistent with individual First Amendment rights to speak one's conscience or not speak one's conscience. "Community values" is not and cannot be defined by who is the most vocal.

The net effect is that the concept of "values of the community" simply is incapable of being defined in a manner that will comport with the due process requirements outlined herein. Appellees have never made an effort to even try and do so because it simply cannot be done. Any definition of "community values" is

going to be inherently dependent upon the political, social, and moral assumptions of the individual trying to define it – which is prohibited. *Miller*, 622 F.3rd at 539; *Reynolds*, 732  F.Supp. 3rd at 807.  Appellee Miller's reliance on the "values of the community" to justify discipline of Ms. Cahall violated her due process rights.

### 4.   Board Policy 2240's Unconstitutional Vagueness Is Compounded By The Lack of a Scienter Requirement

Board Policy 2240 lacks a mental state of mind requirement that – coupled with the lack of any workable standard to determine what is or is not "controversial" – has the practical effect of making it more likely that Board Policy 2240 can be violated accidentally or by inadvertence.  A scienter requirement is essential given the lack of clarity as to what constitutes a "controversial issue" or what constitutes an "instructional program."  Nothing in Board Policy 2240 requires an educator to act "knowingly" or "purposefully" before a sanction can be imposed.  The absence of a scienter requirement in Board Policy 2240 leaves New Richmond teachers vulnerable to sanction is they inadvertently cross the undefined boundary between what is controversial and what is not or – in Ms. Cahall's case – guess wrongly as to what the "values of the community" are or what who determines them might decide they are.

The Supreme Court has recognized that a scienter requirement may mitigate a law's vagueness by limiting a limiting a law's scope just to those who knowingly engage in a particular course of conduct.  *Hoffman Estates*, 455 U.S. at 499 ("the

36

Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed"). The Supreme Court has also recognized that "in the absence of a scienter requirement . . . [a] statute is little more than 'a trap for those who act in good faith.'" *Colautti*, 439 U.S. at 395.

A scienter requirement would require that a person act with a specified mental state (i.e., knowingly or purposely); accordingly inclusion of a scienter requirement in Board Policy 2240 would reduce the possibility that a person will be held responsible for certain actions without fair notice as to what such actions are prohibited. Cf. *Papachristou*, 405 U.S. at 163 (presence of a scienter requirement can "protect[] from being caught in the [enforcement] net by the necessity of having a specific intent to commit an unlawful act").

As stated above, the absence of a scienter element was a central basis for the striking down of the New Hampshire statutory scheme in *Edelblut I*, 444 F.Supp. 3rd at 460. It is equally problematic here, particularly given the other provisions of Board Policy 2240 that facially appear to support or endorse the discussion of "controversial issues" in the classroom.

5.     <u>The Inconsistencies In How The District Applies Board Policy 2240 Evidence Its Unconstitutionality Both Facially And As Applied To Ms. Cahall</u>

Appellees' "obviousness" argument and the reasonableness of the inferences they want drawn simply are not supported by the record.  The evidence in the record – including that in the proposed Amended Complaint – establishes that appellees have other books in the elementary school library available to all students that feature LGBTQ+ characters or can be construed as "sexual."  It is not disputed that appellees have books from the "Captain Underpants" series in the Monroe school library that also feature a gay character (RE 17-1 and 17-2, *Proposed Amended Complaint* at ¶ 50, Page ID # 159, 175).[7]  The question raised by the inclusion of such books in the elementary school library and in open circulation is obvious –***why*** should it be so "obvious" to Ms. Cahall that maintaining books in her personal classroom library that feature a gay character would be prohibited when the District is maintaining other books in its school library that feature a gay character?  Appellees never answered this.  At least at the pleadings stage, the inclusion of these books obviates any inference (reasonable or otherwise) that it should have been "obvious" to Ms. Cahall that her possession of the four disputed books in her personal classroom library ran afoul of Board Policy 2240.  Appellees cannot argue otherwise.

---

[7]     Although appellees opposed the motion to amend, they admitted that the "Captain Underpants" series features a gay character (RE 19, Page ID # 196).

Likewise with the inclusion of the book "Boy Crazy Stacey" in the elementary school library. The cover (RE 17-1 and 17-3, *Proposed Amended Complaint and Jury Demand* at ¶ 51, Page ID # 160, 180) could be viewed as "sexual" or provocative (reasonably or unreasonably) depending upon one's viewpoint and therefore inappropriate for an elementary school library. It could be viewed simply as inappropriate in an elementary school setting. That inference is to be afforded to Ms. Cahall at this stage of the litigation, and it is not an unreasonable inference. This book's inclusion in the elementary school library only serves to add to the confusion over what is "controversial" under Board Policy 2240 – confusion that stems directly from the utter lack of any meaningful standard to guide teachers as to what is or is not "controversial" and to guide those who enforce it in determining what is or is not "controversial."[8]  Again – appellees cannot argue otherwise.

### 6.    The Books At Issue Are Not "Sexual" Or About "Sexuality"

Appellees have also argued that the inclusion of an LGBTQ+ character into a fictional story somehow automatically makes the book about "sexuality" or makes the book's plot "sexual" (RE 12, *Motion for Judgment on the Pleadings*, at 12, 15, 18, Page ID # 64, 67, 70).

---

[8]    These inconsistencies also highlight the significance of the lack of a scienter requirement in Board Policy 2240.

This is wrong on multiple levels. First, it is an improper inference for appellees to request at the pleadings stage. While appellees want the Court to draw this inference, at the pleading stage and upon *de novo* review all reasonable inferences are to be drawn in favor of Ms. Cahall – not the appellees.

Second, these are loaded terms that are intended solely to provoke a reaction – particularly in a case that arises in an elementary school setting. To overstate the obvious – **_no one_** is advocating that overtly sexual material has any place in an elementary school. However, these particular terms do not have any relevant factual context or support in this case.

The pleadings allege that none of the four books at issue advocated for or against any particular lifestyle, that none of the books are obscene and that none describe sexual contact or activity (RE 1, *Complaint*, ¶ 44-47, Page ID # 11). These are allegations that must be taken as true for purposes of a motion for judgment on the pleadings.

Beyond that, at no point have appellees referenced any specific language or portion of any of the books at issue that they contend could or should be construed as "sexual" in nature or that advocate any type of "sexuality." They cite no language in any book that can reasonably be construed as advocating for or against any particular "sexual orientation" or "gender identification." They cite to nothing that

can be described (fairly or unfairly) as "obscene" or that describes or references sexual activity.[9]

Appellees simply seem to argue that a book inherently becomes "sexual" simply because of the sexual orientation or gender identity of one of the characters. This is irresponsible and is rooted in precisely the type of "shock appeal" to fear or prejudice that the void for vagueness doctrine is intended to protect against. A book that has an LGBTQ+ character is no more "sexual" or about "sexuality" than a book featuring an African-American character (or one of any ethnicity) is about "racism" or racial issues, or a book featuring a Jewish or Muslim character (or someone of any religion) is about religion or an attempt to proselytize someone to or away from a particular ethos or faith. The inference that appellees seek to draw from whom the characters in the books are simply is unreasonable and unfounded and should be outright rejected.

---

[9]     The books are identified by title in the complaint and therefore appellees could have made such references in their motion to support their position. See, e.g., *Amini v. Oberlin College*, 259 F.3rd 493, 503 (6th Cir. 2010). They did not and have waived any such argument on appeal. Even if the books are not considered to be a part of the pleadings, appellees could have filed a summary judgment motion instead of a motion for judgment on the pleadings, introduced the books as evidence and then provided proper evidentiary support for any contention that the books are "sexual" or about "sexuality." They did not.

**III.**   **The District Court Erred In Denying Ms. Cahall's Motion for Leave To Amend Her Complaint**

Civil Rule 15(a)(2) provides that leave to amend shall be "freely granted when justice so requires."  With respect to the substantive due process claims, the proposed amended complaint highlights inconsistencies in the appellees' interpretation and application of Board Policy 2240 – inconsistencies that can be attributed to the lack of any meaningful standards for determining what is or is not "controversial" under the legal standards set forth herein for applying the "void for vagueness" test under the Substantive Due Process Clause and the lack of any discernable enforcement guidelines to ensure that those charged with enforcing and implementing Board Policy 2240 do so in a manner that is free from any objective enforcement criteria and thus invites arbitrary, discriminatory and overzealous enforcement.

It simply is not open to dispute Ms. Cahall was disciplined for having books in her personal classroom library that have characters that identify as LGBTQ+ – books that are not in regular circulation within the school – even though the District has books from the "Captain Underpants" series ***in regular circulation*** within the elementary school that feature an LGBTQ+ character (RE 17-1 and 17-2, *Proposed Amended Complaint and Jury Demand* at ¶ 50, Page ID # 159, 175).  As previously discussed, this raises very serious issues not only about how what is or is not "controversial" under Board Policy 2240 is determined, but whether the mere

presence of a book featuring an LGBTQ+ character can even be considered "controversial" under Board Policy 2240.

The proposed amended complaint introduces additional evidence that highlights the fundamental inconsistency in how the District applies Board Policy 2240. It is a reasonable inference that the inclusion of the "Captain Underpants" books in the school library shows that the inclusion of books with LGBTQ+ characters in a classroom library is not "controversial" under Board Policy 2240. Ms. Cahall is entitled to this inference at the pleading stage. It becomes incumbent upon the appellees to show why this inference is not a reasonable inference and they made no effort to do so. The same is true with respect to the appellees' inclusion of the book "Boy Crazy Stacey" (RE 17-1 and 17-3, *Proposed Amended Complaint and Jury Demand* at ¶ 51, Page ID # 160, 180) in the Monroe elementary school library.

It does not suffice for the appellees to simply propose alternate inferences more favorable to them that they believe can be drawn from the facts – the standard to be applied in the context of a motion to dismiss or for judgment on the pleadings is that ***all*** reasonable inferences are to be drawn in favor of the ***non***-moving party. It was error for the District Court not to afford this reasonable inference to Ms. Cahall at this stage of the case and to deny leave to amend the complaint to include additional factual allegations that highlight the inconsistencies in the appellees'

interpretation and application of Board Policy 2240 and the lack of any meaningful standards for the interpretation, application and enforcement of Board Policy 2240.

## IV. The Dismissal Of Ms. Cahall's State Law Claim Pursuant To Ohio Rev. Code §§ 2307.60 and 2921.45 Must Be Reversed If The Dismissal Of Ms. Cahall's Constitutional Claim Is Reversed

Ohio Rev. Code § 2921.45 makes it a crime in Ohio for a "public servant, under color of the public servant's office, employment, or authority, [to] knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." In turn, Ohio Rev. Code § 2307.60(A)(1) imposes civil liability on one who through their commission of a criminal act has caused injury to one's person or property. A criminal conviction is not a prerequisite for imposing civil liability under § 2307.60. *Buddenberg v. Weisdack*, 161 Ohio St. 3d 160 (2020). Based upon a plain reading of these two statutes, a reversal of the dismissal of Ms. Cahall's federal constitutional claim mandates a reversal of the dismissal of this state law claim as well.

## CONCLUSION

For the reasons set forth herein, plaintiff-appellant Karen Cahall respectfully requests that this Honorable Court:

- Reverse the decision of the District Court granting appellees' Motion for Judgment on the Pleadings;

- Reverse the decision of the District Court denying Ms. Cahall's Motion for Partial Judgment on the Pleadings and declare Board Policy 2240 to be unconstitutional on its face;

44

- Reverse the decision of the District Court denying Ms. Cahall's Motion for leave to amend her complaint; and

- Remand this case for further proceedings.

Respectfully Submitted,


s/*Mark P. Herron*
Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Plaintiff-Appellant
Karen Cahall

# <u>CERTIFICATE OF COMPLIANCE</u>

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

  X  this brief contains 11,732 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

  ___  this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

  X  this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type, or

  ___  this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

(s)    *Mark P. Herron*

Attorney for:  Appellant Karen Cahall

Dated:  February 4, 2026

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was served on all counsel of record through the Court's ECF system this 4th day of February, 2025.

s/*Mark P. Herron*
Mark P. Herron (Ohio Reg. No. 0051998)
5001 Mayfield Road, Suite 212
Lyndhurst, Ohio  44124
(216) 280-2828
Email:  herronlaw@msn.com

Attorney for Plaintiff-Appellant
Karen Cahall

# **ADDENDUM**

RE 1          Complaint                                    Page ID # 1

RE 17-1      Proposed Amended Complaint                   Page ID # 150

RE 25        Opinion and Order                            Page ID # 306

RE 26        Judgment                                     Page ID # 335

RE 27        Notice of Appeal                             Page ID # 336

RE 1-2       New Richmond Board Policy 2240               Page ID # 27-28

RE 1-3       Suspension Notice                            Page ID # 29-30